## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| MICHAEL A. NOLTE, | : | Case No. 3:15-cv-176 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Chief Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.    Introduction

Plaintiff Michael A. Nolte applied for a period of disability, Disability Insurance Benefits, and Supplemental Security Income on December 15, 2011. He asserted that he could no longer work a substantial paid job as of December 31, 2009 due to lumbar degenerative disc disease, permanent colostomy bag from childhood surgeries with some renal issues, anxiety, and depression. His applications, medical records, and other evidence proceeded to a hearing before Administrative Law Judge (ALJ) Amelia Lombardo who later issued a written decision. The result of her decision was the denial of Plaintiff's application based on her central conclusion that Plaintiff was not under a

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

"disability" as defined in the Social Security Act.  Plaintiff brings the present case
challenging ALJ Lombardo's non-disability decision.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the
Commissioner's Memorandum in Opposition (Doc. #12), the administrative record (Doc.
#6), and the record as a whole.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for
further proceedings.  The Commissioner asks the Court to affirm ALJ Lombardo's non-
disability decision.

## II.    <u>Background</u>

Plaintiff asserts that he has been under a "disability" since December 31, 2009.
He filed his applications for benefits on December 15, 2011.  He was forty-one years old
at the time and was therefore considered a "younger person" under Social Security
Regulations.  He has at least a high school education.

### A.    Hearing

#### 1.    Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Lombardo that he is unable to work
because,

> I've got three bulging disks in my back and there is no cartilage in-between
> them.  And plus I've had - - from birth I had 21 operations and the body was
> just pieced together from the very beginning in life, so just over the years,
> you know, working and everything, it just gradually got worse and worse
> and worse.  You know, I can't cut grass hardly.  I can't hardly do anything.
> There's good days and there's bad days, but I pay for it at the end, you
> know.  I will have the colostomy for the rest of my life.

(Doc. #6, *PageID* #s 97-98). He explained that "all the strenuous work of pouring concrete and the bouncing around, it's messed up my back." *Id.* at 99. The pain going from his butt to his sciatic nerve is "excruciating." *Id.* He was born with clubbed feet that had to be surgically repaired. *Id.* at 108. He also has kidney and bladder infections at least one "every couple weeks and then I have to start taking antibiotics." *Id.*

Plaintiff's treatment for his back problems includes pain medication from his primary-care physician, epidural shots, physical therapy, a back brace, and a TENS unit. *Id.* at 100. When his pain gets "unbearable," he goes to the emergency room for a shot. *Id.* at 101-02. He also has difficulties with his colostomy bag. *Id.* at 110. When he bends or his back brace clips the bag, it comes loose, causes messes, and requires him to change clothes once or twice per week. *Id.*

Plaintiff also struggles with anxiety and depression. *Id.* at 104. He has difficulty with crowds of people. *Id.* He attended counseling, but they told him he did not need to have any more appointments. *Id.* Although he is not in counseling, Dr. Patel at Focus Care currently prescribes psychological medication. *Id.* at 111.

Plaintiff has lived at his mother's house since his release from prison two years prior to the hearing. *Id.* at 95. He was in prison on a drug possession charge. *Id.* at 96. He testified that he is not using cocaine and has been clean for three years. *Id.* at 103. A typical day includes "[a] lot of resting and a lot of laying down." *Id.* at 105. He does not sleep well and only gets about "an hour or two of good sleep a night and the rest is a lot of restlessness, tossing and turning." *Id.* at 103-04. He tries to clean dishes and cut the grass for their small yard. *Id.* at 105. Plaintiff's mom does the cooking and laundry. *Id.*

He estimated that he could sit for between fifteen and twenty minutes before having to switch sides. *Id.* at 99. He can walk "maybe half a block…." *Id.* at 101. If he walks too much, he gets blisters on two toes on each foot. *Id.* at 108. He can lift ten to fifteen pounds "at the most." *Id.* at 102. He does not have problems with his arms, hands, or fingers. *Id.*

## 2.      Vocational Expert

Mark Pinti, a vocational expert, testified at the hearing before the ALJ that a person who is limited to light work could not do Plaintiff's former jobs. *Id.* at 114. The ALJ asked how many jobs were available to a person limited to the light exertional level involving "simple, repetitive tasks that are low-stress, which I define as no assembly-line production quotas and not fast-paced. No contact with the general public. Occasional contact with coworkers and supervisors. Occasional ramps and stairs. Occasional stooping, crouching, kneeling, and crawling. No ladders, ropes, scaffolds, heights, or hazardous machinery." *Id.* at 114-15. Mr. Pinti responded that there are at least 25,000 jobs available to a person with those restrictions. *Id.* He later added that there are approximately 2,500 jobs available to a person with those restrictions who was limited to sedentary work. *Id.* at 118. When asked if a person could sustain fulltime work if the person was absent more than three days per month, Mr. Pinti responded, "No. I don't believe so. I believe that anything more than about one day per month of absenteeism would not be tolerated. *Id.* at 117.

4

### B.     Medical Opinions

#### 1.     Grandview Hospital

Plaintiff presented to the emergency room at Grandview Hospital with back pain on March 7, 2010. *Id.* at 718-19. A CT taken of his lumbar spine showed multilevel vertebral end plate degenerative changes. *Id.* at 724. There was a broad-based disc bulge at L5-S1 with no significant spinal cord compression or neural foraminal encroachment. *Id.*

Plaintiff presented to the emergency room again on December 28, 2011. *Id.* at 1082. He reported lower back pain that radiates down his right leg. *Id.* at 1083. They prescribed prednisone and Robaxin. *Id.* at 1085. He returned to the emergency room on December 31, 2011 for back and leg pain. *Id.* at 1095. They prescribed Toradol and tramadol. *Id.* at 1097. On January 22, 2012, Plaintiff returned to request stronger pain medication, as he was using Ultram without relief. *Id.* at 1105. They prescribed prednisone and Flexeril. *Id.* at 1107. On February 26, 2016, he presented to the emergency room again for severe back and leg pain. *Id.* at 1117. They prescribed prednisone and Vicodin. *Id.* at 1119.

#### 2.     Dr. Pamela Coffey

Dr. Pamela Coffey, Plaintiff's family-care physician, began treating him in January 2012. *Id.* at 809. Dr. Coffey determined that Plaintiff needed ostomy supplies because although the colostomy site looked healthy at examination, there was a very high infection risk. *Id.* at 810. Dr. Coffey requested a bladder scan to see if his neurogenic bladder required him to do straight catheters and also to see if it was the cause of his

5

recurrent urinary tract infections.  *Id.*  Dr. Coffey prescribed Bactrim for his recurrent
urinary tract infections.  *Id.*  She ordered an MRI for his sciatica and bulging disc and
continued Plaintiff on Ultram.  *Id.*  In January 2012, an MRI revealed multilevel
degenerative disc disease including a broad-based bulge of the L5-S1 intervertebral disc.
*Id.* at 1029-30.  There was no significant encroachment of the thecal sac or nerve roots.
*Id.*

In March 2012, Plaintiff complained of right sided sciatic pain, noting that he was
currently working laying concrete.  *Id.* at 1025.  Dr. Coffey referred Plaintiff to the pain
clinic for back injections, prescribed Mobic, and increased Plaintiff's prescriptions for
Neurotin and Flexeril.  *Id.*  Plaintiff's sciatica was worse in May 2012, but he reported
physical therapy was helping.  *Id.* at 1023.  Plaintiff also told Dr. Coffey that he was
having problems with his toes, and Dr. Coffey referred him to a podiatrist.  *Id.* at 1024.

In June 2012, Dr. Coffey diagnosed Plaintiff with right subacromial bursitis and
gave him a steroid injection.  *Id.* at 1021.  X-rays in September 2012 revealed a normal
right shoulder.  *Id.* at 1046.  Dr. Coffey gave Plaintiff another steroid injection in October
2012. *Id.* at 1019.

In July 2012, Plaintiff reported that his sciatica pain was worse and that he had
increased numbness and tingling down his right leg.  *Id.* at 1020.  In August 2012, Dr.
Coffey's notes indicate he was experiencing a burning pain in his lower back radiating
down his right leg.  *Id.* at 1020.  Dr. Coffey suggested he meet with surgeons.  *Id.*  In
December 2012, Dr. Coffey indicated he declined surgery and requested to go to a pain-
management clinic to delay surgery.  *Id.* at 1017.  Dr. Coffey's notes from January 2013

indicate he was receiving steroid injections in his back from Dr. Townsend-Smith and he also has a TENS unit.  *Id.* at 1016.

In March 2013, Dr. Coffey noted that an MRI from September 2012 revealed L5-S1 spondylosis with left osseous neural foraminal narrowing impinging on the exiting left L5 nerve root; L4-5 disc desiccation, bulging, and posterior annular tear; and additional degenerative changes.  *Id.* at 939-40, 1015.  Dr. Coffey also noted that Plaintiff's pain was not well-controlled and referred him to the pain clinic for further pain management and possible injections.  *Id.*

On May 6, 2013, Dr. Coffey opined that Plaintiff could lift and carry ten pounds frequently and ten pounds occasionally; stand/walk for three hours in an eight-hour workday and up to thirty minutes on any single occasion without interruption; and sit three hours in an eight-hour workday and up to thirty minutes on any single occasion without interruption.  *Id.* at 1078-79.  She opined that he could occasionally climb and balance, but never stoop, crouch, kneel, or crawl.  *Id.* at 1079.  Dr. Coffey based the limitations on sciatic of his right side and nerve impingement as "seen on MRI."  *Id.*  Dr. Coffey further opined that "vibrations, climbing to high work places, driving machinery, [and] extreme temps can all worsen the sciatica," and as a result, exposure should be limited.  *Id.* at 1080.  Dr. Coffey opined that due to Plaintiff's impairments and treatment, he would miss work more than three times per month.  *Id.* at 1082.  Dr. Coffey concluded that he would not have the residual functional ability to do light work on a sustained basis, but he would be able to do sedentary work on a sustained basis.  *Id.* at 1081.

### 3.    Dr. Omar Siddiqi

Plaintiff began treatment with primary-care physician, Dr. Omar Siddiqi, in July 2013.  *Id.* at 1232.  Dr. Siddiqi noted that Plaintiff had significant back pain.  *Id.*  He also noted that Plaintiff did cocaine the day before and does it daily.  *Id.*  Plaintiff saw Dr. Siddiqi again in August 2013.  *Id.* at 1229.  Dr. Siddiqi refused to prescribe any additional pain medication because he referred him to a pain specialist and Plaintiff was doing cocaine daily.  *Id.* at 1230.

### 4.    Dr. Dimitri Teague and Dr. Leslie Green

On January 13, 2012, Dr. Dimitri Teague, a non-examining State agency physician, reviewed Plaintiff's medical records.  *Id.* at 141-50.  Dr. Teague determined that Plaintiff's severe impairments included a disorder of the gastrointestinal system and chronic renal failure.  *Id.* at 145.  Dr. Teague opined that he could lift/carry twenty pounds occasionally and ten pounds frequently.  *Id.* at 146.  He could stand/walk for six out of eight hours and sit for six out of eight hours.  *Id.*  Dr. Teague also opined that he could only occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; he could never climb ladders, ropes or scaffolds; and he should avoid concentrated exposure to hazards such as heights and scaffolds.  *Id.* at 146-47.  Dr. Teague concluded that Plaintiff was not under a disability.

On August 14, 2012, another non-examining State agency physician, Dr. Leslie Green, reviewed the medical evidence upon reconsideration and affirmed Dr. Teague's assessment.  *Id.* at 166-73.  Additionally, Dr. Green added affective disorder to his severe impairments.  *Id.* at 168.  Dr. Green also added environmental limitations, finding that

8

not only should Plaintiff avoid concentrated exposure to hazards such as heights and scaffolds, he should also avoid concentrated exposure to extreme heat, wetness, humidity, and vibration. *Id.* at 172.  Finally, Dr. Green added that he was moderately limited in his abilities to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. *Id.* at 173-74.

## III.    <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007).  Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…."  *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

## IV.  <u>The ALJ's Decision</u>

As noted previously, it fell to ALJ Lombardo to evaluate the evidence connected to Plaintiff's application for benefits.  She did so by considering each of the five sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. §§ 404.1520, 416.920.[2]  She reached the following main conclusions:

Step 1:    Plaintiff has not engaged in substantial gainful employment since December 31, 2009.

Step 2:    He has the severe impairments of lumbar degenerative disc disease, permanent colostomy bag from childhood surgeries with some renal issues, anxiety, and depression.

Step 3:    He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

Step 4:    His residual functional capacity, or the most he could do in a work setting despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consisted of "sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) subject to the following limitations: occasional climbing of ramps and stairs; occasional stooping, crouching, kneeling, and crawling; no ladders, ropes, or scaffolds; no exposure to heights or hazards; only simple, repetitive tasks that are low stress with no assembly line production quotas and work that is not fast paced; no contact with the general public and only occasional contact with coworkers and supervisors."

Step 4:    He is unable to perform any of his past relevant work.

Step 5:    He could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 74-85). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 84.

## V.   Discussion

Plaintiff contends that the ALJ failed to properly weigh his treating physician's opinion. He also asserts that the ALJ erred in finding that he was not credible. The Commissioner maintains that the ALJ properly weighed the medical opinions of record and substantial evidence supports the ALJ's finding that Plaintiff was not fully credible.

### A.   Dr. Coffey's Opinion

ALJ Lombardo determined that the opinion of Dr. Pamela Coffey, Plaintiff's treating physician, was entitled to little weight. (Doc. #6, *PageID* #82). Social Security Regulations recognize several different categories of medical sources: treating physicians, nontreating yet examining physicians, and nontreating yet record-reviewing physicians. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

11

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."

*Id.* (quoting in part Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996), and citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1)–(2)). To effect this hierarchy, the Regulations adopt the treating physician rule. The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Id.* at 376 (quoting in part 20 C.F.R. § 1527(c)(2)); *see Gentry*, 741 F.3d at 723. If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to

any subsequent reviewer the weight given and the reasons for that weight. *Id*.

Substantial evidence must support the reasons provided by the ALJ. *Id*.

Plaintiff asserts that the ALJ failed to give the appropriate weight to the opinion of

Plaintiff's treating physician, Dr. Coffey. The ALJ determined that "Dr. Coffey's

opinion is not entitled to controlling or significant weight and is given little weight…."

(Doc. #6, *PageID* #82). Although the ALJ included a lengthy explanation of the legal

standards concerning how to weigh medical opinions, she only provided one brief

paragraph to explain the little weight she assigned to Dr. Coffey's opinion:

> Her assessment is internally inconsistent. She offers no basis for her
> opinion that he would miss work more than three times per month. Her
> notes at Exhibit 18F carry a diagnosis of sciatica on the right and note a
> positive straight leg raise on occasion, however they contain no indication
> of unreliability in a work situation; in fact, she reported in one treatment
> note that he was working laying concrete, a job claimant testified that he
> performed for a short period but had to stop due to back pain.

*Id*.

The ALJ must first determine whether a treating physician's opinion is entitled to

controlling weight before evaluating the opinion under the factors. *Gayheart,* 710 F.3d at

376 (citing 20 C.F.R. § 404.1527(c)(2)). In the present case, the ALJ seems to have

determined Dr. Coffey's opinion is not entitled to controlling weight because Dr.

Coffey's opinion is internally inconsistent. Specifically, the ALJ observed that in the

assessment, Dr. Coffey estimated Plaintiff could stand/walk for a total of three hours

during an eight-hour workday, and he could sit for a total of three hours during an eight-

hour workday. (Doc. #6, *PageID* #1078). Dr. Coffey then indicated he has the residual

13

functional ability to do sedentary work on a sustained basis in an eight-hour workday.  *Id.*
at 1081.

Assuming that the ALJ concluded that Dr. Coffey's opinion was not entitled to
controlling weight because of this inconsistency, the ALJ's review is not complete.  In
fact, this is only the start of the required inquiry:

> Treating source medical opinions are still entitled to deference and must be
> weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.
> In many cases, a treating source's medical opinion will be entitled to the
> greatest weight and should be adopted, even if it does not meet the test for
> controlling weight.

*Id.*  The ALJ only provided one other reason for rejecting Dr. Coffey's opinion.

According to the ALJ, Dr. Coffey failed to provide a basis for her opinion that
Plaintiff would absent from work more than three times per month.  (Doc. #6, *PageID*
#82).  However, the ALJ ignores that the assessment form Dr. Coffey completed does not
provide any space for an explanation.  Because the form does not ask for an explanation,
Dr. Coffey's answer must be read in the context of all the information included in the
assessment.  Dr. Coffey explained in support of her opinion that Plaintiff's limited ability
to lift/carry (ten pounds occasionally and frequently) was caused by his right-side sciatica
and by nerve impingement on his left lumbo-sacral nerve as seen on an MRI taken in
September 2012.  *Id*. at 1077-78.  Dr. Coffey also believed that Plaintiff's right-side
sciatica and the nerve impingement on his left side limited him to three hours of
standing/walking during an eight-hour workday.  *Id*. at 1078.  And, to explain why
Plaintiff could sit for a total of three hours in an eight-hour workday, why his postural
activities were limited, and why he was limited in certain physical functions, Dr. Coffey

again pointed to his right-side sciatica and the nerve impingement seen on the MRI. *Id.* at 1078-79. Dr. Coffey noted that work activities of reaching, pushing, and pulling "puts more stress on the affected area creating more pain." *Id.* at 1080. Given the lack of space on the form for Dr. Coffey to explain her opinion – that Plaintiff would be absent on average more than three days per month – this opinion must be read within the context of information Dr. Coffey provided about Plaintiff's impairments elsewhere in the form. By overlooking or ignoring this context, the ALJ unreasonably isolated Dr. Coffey's absent-three-days-per-month opinion from the consistent explanations she repeatedly provided elsewhere in the same form. As a result, substantial evidence fails to support the ALJ's finding that Dr. Coffey failed to provide a basis for her opinion that Plaintiff would be absent more than three days per month on average.

The ALJ also asserts Dr. Coffey's treatment notes contain "no indication of unreliability in a work situation." *Id.* at 82. The ALJ is correct that Dr. Coffey did not indicate in her treatment notes whether Plaintiff was reliable in a work situation. However, there was no particular reason for Dr. Coffey to comment on Plaintiff's reliability at work in her treatment notes, limited as they logically are to medical rather than vocational concerns.

Further, the ALJ failed to acknowledge that Dr. Coffey's treatment records do show that Plaintiff required frequent medical treatment on a fairly consistent basis. For example, Plaintiff met with Dr. Coffey approximately fourteen times during the fourteen-month period between January 2012 and April 2013. *Id.* at 809, 1014-27. Dr. Coffey's notes also establish that Plaintiff received additional treatment from several other

15

providers during the same time period.  For example, she noted that he received x-rays and MRIs, he obtained steroid injections from Dr. Townsend-Smith, he attended physical therapy, and he was referred to surgeons and pain management.  *Id.*  Together, these records establish that Plaintiff would be required to be absent from work to attend medical treatment.

Although the ALJ attempted to minimize the results of the September 2012 MRI, the MRI is objective medical evidence of Plaintiff's impairments.  The MRI revealed concentric disc bulging at L3-4, disc desiccation, bulging, and a posterior annular tear at L4-5, and L5-S1 spondylosis with left osseous neural foraminal narrowing impinging on the exiting left L5 nerve root.  *Id.* at 939-40.  The ALJ contends that Plaintiff's nerve impingement on the exiting left L5 nerve root shown in the MRI is inconsistent with the EMG that primarily showed problems on Plaintiff's left side.  In response, Plaintiff asserts that the medical community recognizes lumbar disc herniation with contralateral symptoms.  (Doc. #8, *PageID* #1252) (citing Hasan K. Sucu & Fazil Gelal, *Lumbar Disk Herniation with Contralateral Symptoms,* 15 Eur. Spine J. 570 (2006), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3489328/).  As acknowledged by the ALJ, the MRI occurred after the State agency record-reviewing physicians reviewed Plaintiff's records.  Thus, Dr. Coffey is the only physician that examined the MRI and formed a medical opinion based on the results.

The Commissioner claims that the ALJ provided a "myriad of reasons" for giving Dr. Coffey's opinion little weight.  (Doc. #12, *PageID* #1271).  But the Commissioner then only points to the internal inconsistencies in Dr. Coffey's assessment and the limited

explanations provided by Dr. Coffey.  *Id.* at 1271-72.  The two reasons provided by the ALJ do not amount to "good reasons" for rejecting Dr. Coffey's opinion.  At best, the ALJ superficially examined internal inconsistencies and the supportability of one answer given by Dr. Coffey.  But she failed to address any other factors, specifically overlooking the length, frequency, nature, and extent of the treatment relationship; consistency with the record as a whole; and specialization.  "The failure to provide 'good reasons' for not giving [the treating physician's] opinions controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule…." *Gayheart,* 710 F.3d at 377.  The ALJ's reasons for rejecting Dr. Coffey's opinions are not supported by substantial evidence.  Therefore, the ALJ's finding that Dr. Coffey's opinion is entitled to "little weight" is also not supported.

Dr. Coffey's opinion that Plaintiff would be absent from work more than three days per month could be dispositive in determining whether Plaintiff is under a disability because the vocational expert testified that missing more than one day of work per month would not be tolerated by an employer.  For that reason, it was critical for the ALJ to carefully review Dr. Coffey's opinions as the Regulations mandate and to determine the appropriate weight supported by good reasons and substantial evidence.  In this case, the ALJ failed to do so.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[3]

---

[3] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's challenge to the ALJ's credibility assessment of Plaintiff is unwarranted.

### B.      Remand Is Warranted

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right.  *Bowen*, 478 F.3d at 746.  Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-47 (6th Cir. 2004); failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff to lack credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits.  *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994).  The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is weak.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is weak.  However, Plaintiff is entitled to an Order remanding

18

this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above.  On remand, the ALJ should be directed to evaluate the evidence of record, particularly the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulation and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for Disability Insurance Benefits and Supplemental Security Income should be granted.

### IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Michael A. Nolte was under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration under Sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4. The case be terminated on the Court's docket.

Date: July 28, 2016                                     *s/Sharon L. Ovington*
                                                         Sharon L. Ovington
                                                         Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).